The first case on the call of the docket for this morning is agenda number 10, number 125020, Nicole Hamby et al. v. Bayer Corporation, Virginia, Sykes. Good morning, your honors, and may it please the court, counsel. I'm Virginia N. Sykes for defendants' appellants here, the Bayer defendants. The plaintiffs in these consolidated cases all allege the same four tort claims involving a permanent contraceptive device called e-short. The Bayer defendants appeal from the denial of their motion to dismiss the claims of 160 non-Illinois plaintiffs in these cases on the ground that the Illinois courts lack personal jurisdiction over their claims. As your honors know, the parties agree that the Illinois courts don't have general or all-purpose jurisdiction over the Bayer defendants because they are not at home in Illinois. The question then is whether the Illinois courts have specific or case-linked jurisdiction over the claims of plaintiffs who are not Illinois residents, who didn't receive the e-short device in Illinois, and who weren't injured in Illinois. For such personal jurisdiction to exist, a plaintiff must show that the defendant engaged in conduct in the state that gave rise to the plaintiff's specific claims. And in its recent decision in Bristol-Myers Squibb, the United States Supreme Court gave guidance about what that requirement means. The court made clear that even if a defendant has many contacts within the state, a state court does not have personal jurisdiction over tort claims by out-of-state plaintiffs suing out-of-state defendants for injuries occurring out-of-state. In that setting, the court held, the substantial connection between a defendant's contacts with the state and a plaintiff's specific claims is missing. And here, just as in Bristol-Myers Squibb, Bayer's general e-short related activities in Illinois cannot somehow create specific jurisdiction over the claims of non-Illinois plaintiffs for injuries occurring in other states. And I'd like to start very concretely and demonstrate this claim by claim. First, the non-Illinois plaintiffs make defective manufacturing claims. But they do not allege that the devices that injured them were manufactured in Illinois. So there is no case-linked jurisdiction over those claims. Second, the out-of-state plaintiffs claim that the physicians who implanted their e-short devices were inadequately trained. But they do not allege that their physicians were trained in Illinois or provided their e-short devices in Illinois. Third, the non-Illinois plaintiffs claim that e-short advertising includes misrepresentations and warranties that were breached. But they do not claim that they viewed or received any advertising or any warranty in Illinois. Or that Bayer wrote any advertising or warranty that they received in Illinois. Finally, they claim that Bayer's warnings about potential issues with e-short were legally deficient. But they do not claim that they received those warnings in Illinois or that Bayer wrote those warnings in Illinois. All of these claims are alleged to arise from actions that Bayer took in other states. And thus the non-Illinois plaintiffs' claims do not arise from Bayer's contacts with Illinois or have a substantial connection with Illinois. A closer look at the Supreme Court's recent decision in Bristol-Myers Squibb is helpful because its facts and its analysis are so analogous to the situation here. In that case, the court considered whether California courts had personal jurisdiction over Bristol-Myers or the non-residents' tort claims about a drug called Plavix. The company had research and laboratory facilities in California, employed 250 sales representatives in California, had a state government advocacy office there, and sold almost 187 million Plavix pills in California. Yet despite all of these Plavix-related connections between Bristol-Myers and California, the Supreme Court held that the California courts lacked specific personal jurisdiction over the non-California plaintiffs' claims because there was not a close enough link between Bristol-Myers' actions, general Plavix-related actions in California, and the claims of the plaintiffs who did not live in California. And the words of the court are critical here. They say these plaintiffs were not prescribed Plavix in California, did not purchase Plavix in California, and were not injured by Plavix in California. And it didn't matter that Bristol-Myers had other general Plavix-related activities in California. The court also rejected a number of the arguments that the plaintiffs here make. The court explained it doesn't matter that other plaintiffs may have been prescribed or received Plavix in California and alleged similar injuries to the out-of-state plaintiffs. That similarity did not give the state jurisdiction over non-residents' claims. And the court also specifically rejected the argument that the necessary tight connection between a plaintiff-specific claim and a state is relaxed if the defendant has other extensive contacts. Instead, the court required a close connection between the defendant's contacts with the state and the specific claims at issue, and found it lacking where the out-of-state plaintiffs were injured elsewhere. Since Bristol-Myers was decided, many courts, including the district courts in Southern District of Illinois and in neighboring Missouri, have declined to find personal jurisdiction in cases very similar to this one. Ms. Dice, do you concede that the first prong, purposely available, has been met? Yes. We are focused on the second prong, which is whether they're sufficient for due process in light of the requirement that there be a close connection between the specific claims and the defendant's contacts, Your Honor. Are there allegations that the warnings at issue in this case were developed at least in part through the clinical trials in Illinois? There are allegations that the clinical trials in Illinois were sufficient contacts to support specific personal jurisdiction here. And yes, I think Your Honor has just accurately described the link that plaintiffs rely on. But there is, in fact, no link that's sufficient for specific jurisdiction between the plaintiff-specific claims and the clinical trials. No non-Illinois plaintiff or her physician is alleged to have participated in the clinical trials or have been injured in a clinical trial or who have known about or relied on Illinois's clinical trials. There is no claim in this case challenging the conduct of the clinical trials or FDA's approval of Eshore, which came out of the clinical trials. And there could not be, Your Honor, because any such claim would be preempted by federal law. So plaintiff's argument is that as long as any part or any step related to a device's approval occurred in Illinois, that's a close enough connection between any claim about a device and the defendant's contacts with the state to create specific personal jurisdiction. That reasoning is entirely inconsistent with Bristol-Myers, which requires a much tighter connection between the defendant's contact and the plaintiff-specific claims. Is the MM case legally distinguishable or factually distinguishable or both for this case? Both, Your Honor. First, MM is, of course, not binding on this Court. And it's also pre-Bristol-Myers-Swipp. So that's important because the Court there did not have the benefit of Supreme Court's analysis in that case. So, for example, the Court in MM says that the requirement that a claim arise under or relate to a defendant's activities in a forum is loose and has a low threshold. Bristol-Myers makes clear that that's wrong, that the inquiry requires a direct and tight link instead. But in MM, the plaintiffs also claim that their injuries were the direct result of the defendant's failure to disclose the effect of the drug on pregnant women during the clinical trials and that the injuries then followed. Here, there is no claim that injuries were at all based on any aspect of the conduct of the clinical trial. And respectfully, if the MM decision means that there is jurisdiction over any drug or device claim in any state where clinical trials occur because they lead to approval, we believe the decision must be wrong in light of BMS, Bristol-Myers-Swipp. Both the Supreme Court and courts in the state have rejected the claim that that kind of remote but-for causation is sufficient for personal jurisdiction. In fact, plaintiffs in the Zeralto cases in the Southern District of Illinois made this exact argument, citing MM to Judge Herndon, and he did not accept it in the decision we cited to you in our briefs, which is called Roland. We submit also, I want to return to the specific inactivities in Illinois that the plaintiffs rely on to allege that defendant's contacts are sufficient here. Plaintiffs try to say that the marketing strategy that was developed in part in Illinois is sufficient, but this argument that general marketing strategy development and marketing in a state is sufficient is, I think, expressly foreclosed by Bristol-Myers-Swipp, where the court noted that there was substantial advertising in California about Plavix, similar to the advertising plaintiffs said they viewed, and the court still found that insufficient to support personal jurisdiction. This is simply too, in the words of the district court that rejected this argument, it is too attenuated a connection between the plaintiff's specific claims and the defendant's conduct. General marketing activities, which bear engaged in virtually every state where Esher was sold, are not sufficient to establish personal jurisdiction when the plaintiff does not allege that she or her physician viewed any marketing in Illinois or marketing that was written in Illinois. And you could do a similar analysis on the other contacts alleged. Plaintiffs rely on the Esher accreditation program for positions, but there is no allegation that any non-Illinois plaintiff's physician participated in that program in Illinois or that such participation caused the non-Illinois plaintiff's injuries. Indeed, there are no allegations in the complaint about any individual non-Illinois plaintiff's physicians at all. We've already discussed the clinical trial activities for Esher in Illinois. As I've pointed out, there is no link between any non-Illinois plaintiff here and any matter related to a clinical trial. This is, again, the type of general activity that the court in Bristol-Myers-Swipp, the general Esher-related activity in the state, that is not sufficiently linked to plaintiff-specific claims to support personal jurisdiction. Finally, we submit it's unreasonable for Illinois courts to assume jurisdiction over claims against Behr by out-of-state plaintiffs for injuries occurring out-of-state. Neither the non-Illinois plaintiffs nor the defendant is at harm here. The parties and witnesses are thus elsewhere. The laws of 30 other states would have to be applied. The links between the plaintiff's claim in Illinois are so attenuated that they cannot distinguish Illinois from dozens of other states where Behr marketed and studied Esher. That's a fact question there. You say that many other states have similar kind of relationships in the sense that there was testing, there was marketing, et cetera, done in other states. We're going to be looking at the complaint here. Are there facts to support the argument you just made that other states have similar interests? Where does that come from? That argument does come from pieces of the record which I will cite specifically to Your Honor on rebuttal. But I would note that in our brief we cite pleadings by the same plaintiff's counsel that make literally the same allegations about Pennsylvania, New Mexico, Missouri, and I think one other state that's not coming to mind right now. But, yes, we think there's support in the record for our argument that Behr's engaged in all of these activities elsewhere, including clinical trials in a number of states. Even leaving all of that aside, the allegations with respect to developing a marketing strategy, developing a physician training program, doing clinical trials in Illinois, none of those, even if proven, would be sufficient to create the kind of link that the Supreme Court requires between the plaintiff's specific claims and Behr's activities because those non-Illinois plaintiffs don't allege that they saw that marketing in Illinois or that their physicians had that training in Illinois or that they were injured by the clinical trial activities in Illinois. All of the non-Illinois plaintiffs' claims arose from Behr activities in other states that would have supported jurisdiction but not from Behr's activities in Illinois. To close, I'd like to return to the point that allowing personal jurisdiction here is inconsistent with recent Supreme Court teachings. We believe the Supreme Court is likely to emphasize again the importance of a tight connection between defendants' forum contacts and the plaintiff's specific claims in the recently granted cases involving Ford Motor Company. We provided the Court with a notice when the Supreme Court granted review in those cases, and we believe that, again, the Court will return to the question of the nature of the link required between a defendant's contact with the state and a plaintiff's claim for specific jurisdiction. We believe that Bristol-Myers resolves this case and that the Court can so rule. But we think if the Court were to have any doubt, the Supreme Court would be providing additional guidance on the nature of the link that's required in its forthcoming Ford decisions. If the Court has no further questions, we ask you to reverse the decision below and order that Behr's motion to dismiss the out-of-state plaintiffs for lack of personal jurisdiction be granted. Thank you. Mr. Jez? Yes, Your Honor. May it please the Court. Once again, Sean Jez on behalf of the Rios and Hamby's plaintiffs. First, I want to thank you, Your Honor, for allowing me to attend this argument in light of the extraordinary times that we're facing in our country. I appreciate you allowing me to be here to argue for our clients. I want to talk about, first of all, that in order to overcome a crime of facial showing that defendants must offer uncontradicted evidence that defeats jurisdiction before this Court's specific jurisdiction. I would remind this Court, as this Court knows, that two district courts, two trial judges, and three appellate judges have already decided that plaintiffs, in these matters, have made a crime of facial showing that their causes of actions arise from the contacts that Behr has made in the state of Illinois. Nowhere in their briefs have they controverted that evidence. In fact, their brief is almost identical to the brief, to the arguments they made at the trial level and at the fifth district. They've shown no new evidence. What the Walden Court has said is that specific jurisdiction focuses on the relationship among the defendant, the form, and the litigation. The relationship must arise out of the contacts that the defendant himself creates before the forum state or with the forum state. The courts have consistently rejected attempts to satisfy the defendant-focused minimum contacts inquiry by demonstrating contacts between the plaintiff and the forum state. It's not the defendant's contacts with the plaintiff's that matter. In fact, the defendants even cite in their brief the Brooke case, which is a case where even an Illinois resident that sued a lawyer from the state of Arizona did not even have jurisdiction in the state of Illinois, where the plaintiff said the claims arose in the state of Illinois. And so what this court must do is look at the facts of each case in order to decide the specific jurisdiction. And the court must look at the claims in this lawsuit. And what we heard from the defense counsel now for the third argument before the court is everything about what the plaintiffs didn't do in the state of Illinois. They didn't have the drug or the extra device implanted in the state of Illinois. Their doctors weren't trained in the state of Illinois. They didn't receive warnings in the state of Illinois. But that's not the focus that this court is to look at. It's specifically to look at the focus of what did Baird, when it purposely came to the state of Illinois to promote its product, what did it do here? And let's talk about what it did here. First of all, Baird created the patient awareness marketing campaign. And what it did is that in 2005, Conceptus, which is the predecessor to Baird, and the court probably recalls from reading the briefs, that in June of 2013, Baird purchased Conceptus, which was the original manufacturer and creator of the E-Shirt permanent control device. Now, what the documents will show in the case is that what the learnings from the Chicago Consumer Awareness Campaign hold true for other marketing efforts nationwide. That's what Conceptus' own employees, is that we have come to Chicago to create this marketing campaign. And based on what we have learned in the state of Illinois, in Chicago, we can now take that forward and move on to a nationwide marketing campaign. There's a distinction between just a broad nationwide campaign where a person may see an advertisement in a newspaper, or something on the internet now, or they may get something in the mail. I agree with the defense there. That's a general issue here. But that's not what happened in the state of Illinois with regard to the E-Shirt product. The whole genesis of their marketing campaign began here, began in the state of Illinois. And because it started right here in the state of Illinois, that's why they have purposely availed themselves to the benefit of Illinois by coming here and doing that. Your opponent has mentioned that there's an allegation that the same claims were made of the conduct of the defendants in other states, in other lawsuits, that similar conduct was happening in other states. Can you respond to that? And is there some distinction between the kinds of conduct that's being alleged? Sure, I absolutely can respond to that. First of all, what this court must look at is the context that came to light in the state of Illinois. It doesn't matter what Bayer did in the state of Missouri or the state of Pennsylvania with regard for jurisdiction in the state of Illinois. This court has to decide, does their jurisdiction over Bayer in the state of Illinois? Not what happened in Missouri. Now, yes, did some of these things happen in Missouri? Absolutely, but they're a little bit distinctive as far as it's not exactly the same thing that they did in Missouri as what they did in the state of Illinois, to answer your question specifically. So specifically about the marketing campaign, was that only in Illinois, or can we tell from the record whether the same marketing campaign preparation was being done elsewhere in the country? I think from the record you can tell that the consumer awareness program began in Illinois. In Missouri, I believe there's some references in the record to other parts of that marketing campaign that were developed. I believe there was a marketing company actually in the state of Missouri that helped then facilitate the distribution of that marketing that was created in the state of Illinois. But again, whether Bayer did something in the state of Missouri or the state of Pennsylvania or in California is not relevant to this court's decision on whether or not there's specific jurisdiction in the state of Illinois because we have to look at specifically what did Bayer do here in the state of Illinois. And so that was one of the things that they did. Now, they also worked on or began the Assured Accreditation Program here where they trained and consulted physicians' practices about patient education on the eSure device, office staff training, customer service orientation, and in fact they used 20 Illinois physicians in 13 practices, and what they learned they shared with all eSure physicians. And so they started that program here. This was the genesis of the eSure Accreditation Program. And the defendants themselves even signed to the Keller case, which was the Illinois Second District case. And in that case, the court talked about specific jurisdiction and whether or not a claim in the state of Illinois or the defendants' contacts in Illinois arose, plaintiff's claims arose out of their contact. And in that case, what the court said was that not only was there a but-for causation that allowed the court to have specific jurisdiction, but that on the legal cause is that the defendants' actions were the birthplace or the genesis of the specific jurisdiction and the facts that their contacts arose from. And so in that case, in the Keller case, you actually have an incident where there's a plane crash from a vintage aircraft in the state of Georgia, which kills one person, injures another one, and the injuries happened in the state of Georgia, which you could say here that for the non-Illinois plaintiffs, the injuries for their eSure may have occurred in the state where they were from. However, because of the specific contacts that that defendant had in the state of Illinois, the Keller case decided that, yes, the defendant was subject to specific jurisdiction with regard to the Illinois state courts because of what contacts they had, and those contacts were the actual repair of the aircraft and the redesign of the aircraft, and that's what the genesis of the crash was in the state of Georgia because the Georgia court determined that the crash was caused by something happening when the mechanical repairs of the aircraft were incorrect. So that's very analogous to this case here. The eSure accreditation program and the patient awareness campaign were the genesis of what brought BEHR to the state of Illinois and what caused the entire campaign to be created nationwide. Counsel, the further we move toward what the company did in general as related to this product and the further we move away from these actual specific claims, are we not analyzing what the Supreme Court referenced in Bristol-Myers, a loose and spurious form of general jurisdiction? No, Your Honors, I don't believe so, and here's the reason why. In the BMS decision, what the court was looking at was the sliding scale of jurisdiction that the California courts were applying. They were basically looking at what court caused and then looking at kind of generally what the defendants were doing in that state. And what BEHR points out in the brief is that there's no distinguishment between the BMS case and this case as far as what happened there, but that's completely wrong because in the Bristol-Myers case, nothing specific to the drug Plavix was developed in that state. There was no clinical trials in that state with regard to the Plavix drug. There was no marketing strategy that was developed in the state of California. There was no doctor training programs or no warnings were developed there. But here in this case, in the BEHR case that we have against BEHR, this is where it all began. First of all, we have the clinical trials that helped launch the drug so that it could be marketed, or excuse me, the products that could be sold. And not only that, to this day, BEHR is still doing post-market studies in the state of Illinois in order to make sure that their labeling was correct and to comply with the requirements of the FDA. In the BMS case, we had none of that there. Nothing with regard to that Plavix product was specifically developed in the state. Obviously, we have that here in at least three different instances. And so that's a big distinction. Can I ask another question while you're rolling? Absolutely. The proper analysis. There's been a lot of talk about causation, but for causation, cause and effect, legal cause. That does not seem to be the kind of analysis that the Supreme Court was using in Bristol-Myers. Am I correct about that? They don't seem to be talking about causation in those kind of ways. No, I don't believe they were. I think they were looking at just the contacts that the plaintiffs had or excuse me, out-of-state plaintiffs had in the state of California. Was there something about the injuries arising from the contacts? Isn't that the link? The arising from? Right. But just to be clear, so it's not necessary to have a discussion here about causation and the big proximate cause kind of ideas. We don't usually go there. Is that right? Well, I think in the state of California, excuse me, the state of Illinois, the causation or the arising out relates to but for plus a legal cause. I don't think the court has decided specifically that we have to go all the way to proximate cause, but what you look at on that analysis, is it foreseeable based on what the defendants have done in the state of Illinois that they would be held in the court in order to answer for their actions? The Supreme Court didn't say foreseeable, didn't say proximate cause, didn't say legal cause. It doesn't use the word cause. No, they do not. They say arising out of, arising out of. That's correct, arising out. Okay. And that's what we claim here is that the cause of action that the defendants or our cause of action arises out of the contacts that the defendants made in the state of Illinois. So, for example, on the warnings claim, let me just go to the doctor training center. BEHR is required to train every physician. In fact, their label says that they have to train every physician before they can implant each device. That training program was developed here in the state of Illinois. In our complaint, we allege that our doctors, that the doctors that implanted our patients did not, were not properly trained. As a result thereof, the injuries that our plaintiffs suffered arise out of that lack of training that they were supposed to receive. And the lack of training took place somewhere other than Illinois. The doctor's conduct that you say they did not have the proper training, their conduct did not take place in Illinois. That's correct. These doctors may not have been trained in Illinois. However, the program for which they were going to be trained for arose from the defendants' conduct in the state of Illinois. So had they not come to Illinois and created this program and employed the 20 Illinois physicians in the 13 different practices areas to develop this training program, they wouldn't have been able to launch forward to other states and then train those physicians in those other states. So the birth or the genesis of that program began here in the state of Illinois. And that's exactly what the Keller case points to. And in fact, the MN case, which I believe is the most dispositive case on point in this matter with regard to any Illinois court that has looked at this issue, specifically cites the Keller case and says that the claims that arose in the MN case were based on the birth or the genesis of the clinical trials of Plavix in the state of Illinois with regard to those claims. Although the Illinois courts don't apply a quantitative test with regard to the number of contacts a defendant has with the state, certainly you look at the quality of those contacts that the defendant has with the state. And in this situation, the quality of contacts that Bayer had with regard to the state of Illinois were much more qualitative than what the contacts that GSK had in the MN case. In the MN case, you only have the clinical trials that support that qualitative analysis of whether or not those contacts or the cause of action arose from that defendant's contacts. Here we have multiple things. We have a marketing strategy that was developed in the state of Illinois. We have a doctor accreditation program. And we have both pre-marketing and post-marketing clinical trials or studies that are still going on to this day with regard to Bayer's contact to the state of Illinois. Is M&M still good law after Bristol-Meyers? Counsel notes that, of course, Bristol-Meyers was after M&M. Yes, M&M, you're exactly right. M&M was, BMS was after M&M. And, yes, absolutely it's still good law. And here's the reason why. First of all, Bristol-Meyers doesn't change the law with regards to arising out of contact. I think what Bristol-Meyers was to show the example of what was going on in California with their sliding scale approach and why the Supreme Court wanted to clarify that that sliding scale approach is not what you look at. Justice Sotomayor may disagree with your comment there. I mean, if you read in her dissent that she talks about the constriction of specific jurisdiction based upon this case. Yes, that is correct. However, what you're looking at here with regard to the BMS decision, the BMS decision actually slides to the Burger King case, which began with the arising out of it. There's nothing that, nothing changes with regard to the way courts should look at specific jurisdiction based on the BMS case. Because that just follows a long lineage of cases that talked about specific jurisdiction, specifically including the Burger King case. Now, also with regard to the M&M case, the M&M case, and there's a lot in the briefing about with regard to that, although the M&M case predates Bristol-Meyers, where the U.S. Supreme Court had the opportunity to look at the M&M case and they denied cert with regard to that case and didn't look at it. That case was before and they could have taken it up and said, well, you know, we don't believe that this was an appropriate connection here between these, between the defendant's conduct and what happened in the M&M. Why is that important? I know that it doesn't necessarily have any precedential value with regard to the Supreme Court denying their review of that. But what the court should look at is that on the very same day, on October 2nd of 2017, when the Supreme Court denied cert with regard to the M&M case, it granted a GDR with regard to the Lawson case on October 2nd, 2017, exact same day. And in that case, they sent it back and said the court needs to relook at the contacts of the defendant to determine whether or not that plaintiff's cause of action arose from the defendant's conduct. So we have cases on a parallel track. In one case, the Supreme Court, the M&M case, doesn't look at it. They obviously, if they would have thought there was something wrong there, I would assume that they would have sent a GDR just like they did in the Lawson case. The Lawson case, which originally had determined there was specific jurisdiction based on the specific conduct of the contacts of the defendant, and that's in the state of Arkansas, later reversed and said there was no specific jurisdiction. So if we're going to read tea leaves, what do we take from the granted certiorari in the Ford-Moto case, where apparently the court is going to venture back into this discussion about whether a rise out of or relate to requirements for specific jurisdiction is met when none of the defendant's forum contacts caused the plaintiff's claims? Well, if I could read the tea leaves... We can't really read the tea leaves. We can't really, whether the court granted cert or not, we have to wait to see what they're going to say. Right. Absolutely, in those Ford cases, it's a little bit different. Those were plaintiffs, those were injuries in the states. The cause of action, the claim there by the defendants is that the vehicles were not designed in those states, although the crash is happening. I see that my time is up, Your Honors. Thank you very much for the opportunity. Thank you, Mr. Chess. Ms. Ice? Thank you, Your Honors. The citations that I promised you are on page 7 of our opening brief and page 13 through 15 of our reply brief, and I'll just give you a short sample. In Missouri, the Plaintiff's Counsel argued that this same nationwide marketing strategy was, quote, created in Missouri and then rolled out nationwide. Similarly, with respect to physician training in Missouri, the Plaintiff's Counsel argued that Bayer partnered with Missouri-based companies to create the eSure accreditation program in Missouri. So the citations that we've given you will demonstrate that these allegations about Bayer's conduct in Illinois are very similar to allegations they've made about Bayer's general conduct related to eSure in a number of other states. And in those instances where the district courts, again, the Southern District of Illinois and Missouri have considered those arguments, they have found that those kinds of allegations are just too attenuated from the plaintiff's specific claims to constitute a basis for specific personal jurisdiction. And in saying that, they rely heavily on the analysis in Bristol-Myers-Squibb, which looked and emphasized that you have to look at a plaintiff's specific claims. So it's these non-Illinois plaintiffs' viewing of advertising. Where did they do the advertising? These plaintiff's physicians that they allege were not adequately trained, were they trained in Illinois? No. Were the clinical trials, again, that were conducted in Illinois, the source of an injury that occurred to the non-Illinois plaintiffs? No. Not in the sense that specific connection is required. They simply formed the basis for the FDA's approval of eSure, which is unchallenged. And it is not the cause or the arising out of kind of relationship that the Supreme Court required with the specific claims. And if you read BMS carefully, you will see the court's focus is not on the defendant's contacts with the forum, which are essential for fair play, but which are not the key to the analysis of whether or not a claim, a plaintiff's specific claim, arises out of the defendant's contacts with the state. That's different, and that requires an examination of the plaintiff's specific claims. And I want to say a few more things about some of the comments my opponent made. In the Keller case, which did articulate for Illinois a legal cause standard, the plane was sold in Illinois through a broker in Illinois, warrantied in Illinois, and so the court concluded that in that sense, the injuries which occurred from the deficiency in the plane arose sufficiently out of the particular contacts with Illinois. That is a far cry from arguing that some development of some marketing campaign in Illinois, which marketing was not the marketing viewed or seen by the plaintiff alleged to have been misleading, has a sufficient contact with the state to support personal jurisdiction over a claim of a plaintiff who viewed marketing elsewhere. I want to talk a little bit about the MM case and the argument that BMS did not change the law. What the test is, is arising out of or related to, and as Your Honor surely knows from applying similar kinds of tests, the devil is in the details or in the application of that test. And the reason the Supreme Court did change the law in BMS is because what it was doing was giving guidance to lower courts explaining that they had not properly interpreted the stringency with which the arising out of test must be applied, that you have to look carefully at specific claims, and so the claims of the plaintiffs, the non-California plaintiffs about plastics resulted from conduct of the out-of-state plaintiffs and out-of-state defendants, out-of-state and injuries occurring out-of-state. That wasn't good enough, and the court was giving guidance on that. My opponent says the court's denial of cert in that case is instructive, but it is not. It is no more precedential than this court's denials of its discretionary review. And in fact, I do think the granting of certiorari in the Ford case reveals the court's continuing concern with the failure to require appropriately close linkage between specific claims made by a plaintiff and the defendant's conduct with a specific forum state in order to obtain personal jurisdiction. If there are no further questions, I'd again ask that you reverse the judgment of the appellate. Thank you. Case number 125020, Nicole Hamby v. Bayer Corporation, taken under advisement as Agenda Number 10. Thank you, Ms. Sieck and Mr. Jez, for your arguments this morning.